**1817.**

Selby
vs
Williss

The cause was argued before CHASE, Ch. J. and JOHN-
SON, MARTIN, and DORSEY. J.

*Chambers,* for the Appellant, cited *Abbot vs. Plumbe,*
1 *Doug.* 216. *Call vs. Dunning,* 4 *East.* 53. *Barnes vs.
Trompowsky,* 7 *T. R.* 266, *(note c.) Cooke vs. Woodrow,*
5 *Cranch,* 13. *Peake's Evid.* 96, 97, 98. *Grellier vs.
Neale, Peake's N. P.* 146; and *Lowe vs. Jolliffe,* 1 *W. Blk.
Rep.* 365.

*J. E. Barroll,* for the Appellee.

JUDGMENT AFFIRMED.

---

JUNE (E. S.)　　　　　　SELBY's Lessee vs. WILLISS.

J S, by his will in 1790, devised certain lands to his two sons J and D, and his three daughters N, and B, in trust for his son W and he authorised the trustees to sell all or any part of the lands in order to buy other lands, with the money arising from such sale, for the benefit of his son W, as should appear to a majority of his trustees to be most for his W's benefit; and if his son W should die without lawful issue, he then gave the lands to his above mentioned five children. In 1793 W, J, D and N, sold the lands to J W in fee simple, and on the purchase money being paid, they conveyed the lands to him. When this deed was executed, J, D, W, N, P, and B, were all alive and of full age, and N was at that time a *feme covert,* and afterwards died leaving four children. W died intestate, and without issue, before the death of N. On an ejectment brought by the heir of one of the trustees against J W, for one undivided twentieth part of the lands—*Held,* that he w s not entitled to recover.

APPEAL from *Worcester* County Court. Ejectment for
one undivided twentieth part of the tracts of land, called
*Chance, John's Purchase, Wild Cat,* and *Addition to Wild
Cat.* Defence was taken on warrant, and the general is-
sue pleaded. The facts as agreed upon were these: A
certain *John Selby* died seized of the lands in question,
having by his will, dated the 13th of November 1790, de-
vised as follows: "*Item,* I give and bequeath unto my two
sons *James* and *Daniel,* and to my three daughters *Nancy,
Polly* and *Betty,* the land I bought of *John Sturgis,* and
all my land which lies on the north side of *Caulker's*
Creek; also one negro woman called *Hannah,* and her two
children, in trust for my son *William,* and his heirs; and
I do direct, and do hereby authorise and empower my said
trustees, and their heirs, to rent out the aforesaid lands,
and hire out the aforesaid slaves, for the use and benefit
of my said son *William,* or his heirs, or to sell all or any
part of the said lands in order to buy more lands, with
the money arising from such sale, for his benefit, as shall
appear to a majority of my said trustees to be most to his
benefit. I also empower my said trustees, or a majority
of them, to settle my said son *William,* on any part of
the aforesaid lands, if they in their discretion may think
it advisable. And if my said son *William* shall have chil-
dren by any marriage, I then empower my trustees, or a
major part of them, to convey the aforesaid lands and ne-
groes to such of my said son *William's* children as they,
or a majority of them, may think proper; but if my said
son *William* shall die without lawful issue, I then give the
lands and negroes aforesaid devised in trust as aforesaid.
to my five children *James, Daniel, Nancy, Polly* and *Bet-
ty,* to be equally divided between them and their heirs
for ever " On the 31st of December 1793, *William,
James, Daniel* and *Nancy,* sold the lands mentioned in
this will, to a certain *Jabez Williss,* in fee simple, for the
sum of £150 15 0, which sum being paid by *Williss* to

the bargainors, they afterwards, on the same day, executed a deed conveying to him the lands in question. At the time of the execution of this deed, *James, Daniel, William, Nancy, Polly* and *Betty*, mentioned in the will, were all alive and of full age, and *Nancy* was at that time a *feme covert*, married to one *Gunby*, and afterwards died leaving the following children and heirs at law, to wit. *George, Betty, John* and *Ann. William*, named in the will, died intestate and without issue, before the institution of this suit, and before the death of *Nancy*. The defendant claims title under *Jabez Williss*, by devise. The present suit was brought by one of the heirs of the said trustees. Upon these facts the county court gave judgment for the defendant, and the plaintiff appealed to this court, where the cause was argued before CHASE, Ch. J. and JOHNSON, and DORSEY, J. by

*Bullitt*, for the Appellant, and by
*J. Bayly*, for the Appellee.

JUDGMENT AFFIRMED.

## WALLS vs. HEMSLEY, *et al.*

APPEAL from *Queen Anne's* County Court. This was a petition for freedom, preferred by the appellees against the appellant. The general issue was pleaded.

*The reputation of the neighbourhood, that the mother of a petitioner for freedom, is not admissible in evidence. The declarations of a person since dead, but then holding the mother of a petitioner for freedom in slavery, that she was a slave, are not admissible in evidence.*

1. At the trial the petitioners proved by *G. Griffin*, that some time before the surrender of *York Town* to the *American* army, the witness had gone to *James* River, with one captain *J. Sweat*; that he was afterwards transferred to the *Baltimore* Galley, and after the surrender of the *British* he again went on board captain *Sweat's* vessel and went into *York* River. That about two or three weeks after the said surrender, he left *York Town*; that before he left there he had been on shore at *Gosport*, where he had seen negro *Suck*, the mother of *Henny*, one of the petitioners, selling cakes and beer without control; and that he saw her repeatedly afterwards selling cakes and beer at the shore of the river at *York Town*, until the day before captain *Sweat* sailed, when *Suck* was brought on board his vessel by five or six men at about 9 o'clock at night, and purchased by *Sweat*. That another black woman was brought on board captain *Sweat's* vessel by the same persons, who was released and set on shore in consequence of her cries and screams. That *Sweat* had informed *Suck* that he would make her his wife. That *Suck* had said, during her passage to *Maryland*, that she was sorry she had come away, as she was free in *Virginia*, and had a white husband there. On cross examination, the witness was asked if he had heard the story of kidnapping mentioned